IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) **(UNDER SEAL)** |
| | ) |
| v. | ) CRIMINAL NO. 1:15-CR-290 |
| | ) |
| | ) Count 1: Conspiracy to Distribute Five |
| NOE MONTES-BOBADILLA, | ) Kilograms or More of Cocaine |
| a/k/a "Ton," | ) Knowing and Intending that it |
| | ) will be Unlawfully Imported |
| ERLINDA RAMOS-BOBADILLA, | ) into the United States |
| a/k/a "Chinda," | ) (21 U.S.C. §§ 959(a), 963) |
| | ) |
| ALEJANDRO MONTES-BOBADILLA, | ) |
| a/k/a "Pimpi," | ) Forfeiture Notice:   21 USC § 853; |
| | ) |
| JUAN CARLOS MONTES-BOBADILLA, | ) |
| a/k/a "Mono," | ) |
| | ) |
| JOSE DEL TRANCITO GARCIA-TERUEL, | ) |
| a/k/a "Pipo," | ) |
| | ) |
| ARNULFO FAGOT-MAXIMO, | ) |
| a/k/a "El Tio," | ) |
| | ) |
| Defendants. | ) |

**FILED**

OCT – 8 2015

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

## INDICTMENT

OCTOBER 2015 TERM - at Alexandria, Virginia

THE GRAND JURY CHARGES THAT:

## COUNT ONE

From in and around 2006 and continuing thereafter up to and including the date of this

Indictment, the exact dates being unknown to the Grand Jury, within the jurisdiction of the United States and in an offense begun and committed outside the jurisdiction of a particular State or district, including in Honduras, Colombia, Panama, Guatemala and elsewhere, the defendants NOE Montes-Bobadilla (also known as "Ton"), ERLINDA Ramos-Bobadilla (also known as "Chinda"), ALEJANDRO Montes-Bobadilla (also known as "Pimpi"), JUAN CARLOS Montes-Bobadilla (also known as "Mono"), Jose Del Trancito GARCIA-TERUEL (also known as "Pipo"), and Arnulfo FAGOT-MAXIMO (also known as "El Tio"),[1] who will be first brought to the Eastern District of Virginia, did knowingly and intentionally combine, conspire, confederate, and agree with othersknown and unknown to the Grand Juryto knowingly and intentionally distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, knowing and intending that such substance would be unlawfully imported into the United States, in violation of Title 21, United States Code, Sections 959(a) and 960(a).

GENERAL ALLEGATIONS

At all times relevant to this Indictment:

1.     Members of the Montes-Bobadilla family, to include NOE, ERLINDA, ALEJANDRO and JUAN CARLOS, led and continue to lead one of largest drug trafficking organizations in Honduras (the "MONTES DTO"), responsible for the distribution of multi-ton quantities of cocaine into the United States valued at millions of U.S. dollars.

2.     The MONTES DTO maintains its base of operation in Colón, a Department, or State of Honduras, located on the northeastern coast on the Caribbean Sea.   The MONTES

---

[1] Each defendant will be referred to herein by the portion of his or her name that is in all capitalized letters in this paragraph.

2

DTO's base of operation in Colón provides a convenient location for the MONTES DTO to receive air and maritime shipments of cocaine from Colombia and other South American source countries that ultimately are destined for the United States.

3.     Colombia is responsible for the production of the vast majority of the cocaine that is imported into the United States.   Honduras is a major transit country for Colombian cocaine, as well as other illegal narcotics.   Large shipments of cocaine are delivered from Colombia and other countries in South America to Honduras via non-commercial aircraft and maritime shipping routes.   During the first half of 2013, approximately eighty-six (86%) of the primary flow of the cocaine trafficked to the United States first transited through the Mexico/Central American corridor.   In 2012, approximately seventy-five percent (75%) of all cocaine smuggling flights departing South America first landed in Honduras.   There is no substantial domestic drug market in the Central American countries and Mexico for cocaine, while there is robust demand for the drug in the United States.

4.     The Caribbean coastal region of Honduras is a primary landing zone for drug-carrying flights and maritime traffic.   The region is strategically critical for narcotics trafficking and the MONTES DTO as the result of to its remoteness, limited infrastructure, lack of government presence, and weak law enforcement institutions.   The MONTES DTO uses airplanes, boats, and land motor vehicles to transport and distribute cocaine from the Caribbean coastal region to areas further north, in Honduras and elsewhere.

5.     The price of cocaine increases at each stage of the supply chain as the cocaine is transported from Colombia to Honduras and further north to the United States. The incremental price increases enable multiple drug traffickers to make substantial profits on the shipments of cocaine.

3

6.    The MONTES DTO is comprised of several members of the Montes-Bobadilla family, as well as other close associates, who perform various tasks and take on various roles in furtherance of the conspiracy:

a)    NOE is the leader of the MONTES DTO in Honduras.   NOE oversees all MONTES DTO operations, to include: the importation of cocaine from South America to Honduras; the transportation and distribution of cocaine within Central America; the receipt and issuance of payment; the employment of underlings; and the avoidance of law enforcement detection;

b)    ERLINDA is the mother of NOE, ALEJANDRO and JUAN CARLOS and is a leader within the MONTES DTO, who assists her sons in the importation, transportation and distribution of cocaine.   ERLINDA keeps many of the MONTES DTO's assets and properties in her name to avoid detection and seizure by Honduran law enforcement;

c)    ALEJANDRO is a partner with NOE and the leader of a cell within the MONTES DTO that operates with its own supply chains and distribution networks;

d)    JUAN CARLOS is a partner with NOE and the leader of a cell within the MONTES DTO that operates with its own supply chains and distribution networks;

e)    GARCIA-TERUEL is a top lieutenant within the MONTES DTO who brokers cocaine deals for NOE and coordinates the logistics of cocaine transactions withSouth American sources of supply;

f)    FAGOT-MAXIMO is an associate of the MONTES DTO who receives maritime

4

shipments of cocaine for the MONTES DTO in the Department of Gracias a Dios, Honduras.

## WAYS, MANNERS AND MEANS OF THE CONSPIRACY

The primary purpose of the conspiracy was to make as much money as possible by trafficking cocaine destined for distribution in the United States through the areas controlled by the MONTES DTO in Honduras. The defendants and their co-conspirators used the following ways, manners and means, among others, to carry out this purpose:

7.    It was part of the conspiracy that the defendants and their co-conspirators played different roles, took upon themselves different tasks, and participated in the affairs of the conspiracy through various criminal acts.

8.    It was part of the conspiracy that the MONTES DTO purchased multi-ton shipments of cocaine from South American sources of supply and imported the cocaine into Honduras for distribution to Central American and Mexican drug trafficking organizations.

9.    It was part of the conspiracy that the MONTES DTO also acted as a transportation organization, moving cocaine shipments owned by other drug traffickers through its vast and tightly controlled air and maritime infrastructures.   The MONTES DTO generally charged other drug traffickers a transportation fee of approximately ten percent (10%) of the value of the product on each load, with the payment made in cocaine.

10.    It was part of the conspiracy that NOE, ERLINDA, ALEJANDRO, JUAN CARLOS and their co-conspirators used multiple methods of transport to import cocaine into Honduras and distribute cocaine within Central America and Mexico, to include non-commercial aircraft, maritime vessels (including boats and semi-submersibles), and commercial and private motor vehicles.

11.     It was part of the conspiracy that GARCIA-TERUEL would, at times, negotiate the terms of drug transactions and coordinate maritime shipments of cocaine into Honduras on behalf of NOE.

12.     It was part of the conspiracy that FAGOT-MAXIMO would, at times, receive maritime shipments of cocaine in the Department of Gracias a Dios for the MONTES DTO.

13.     It was part of the conspiracy that the MONTES DTO used an estuary system to move drug shipments by boat from the Caribbean Sea to the MONTES DTO's base of operations in Francia, Colón.   When air and maritime shipments were received in remote areas of the Department of Gracias a Dios, the MONTES DTO moved the shipments aboard go-fast boats to the vicinity of Francia, Colón.

14.     It was part of the conspiracy that the MONTES DTO and its individual members maintained an arsenal of firearms to protect and further the operation of the MONTES DTO.

15.     It was part of the conspiracy that the MONTES DTO relied on violence, including kidnapping and murder, as a means of intimidation to further the objectives of the conspiracy.

16.     It was part of the conspiracy that the MONTES DTO exercised influence over individuals acting within an official capacity in Honduras by means of bribery, threats, intimidation and violence.

17.     It was part of the conspiracy that the MONTES DTO frequently transported cocaine for, and supplied cocaine to, a Honduran drug trafficking organization headed by brothers Miguel Arnulfo Valle Valle and Luis Alonso Valle Valle (the "VALLE DTO"), which was based in the Department of Copán in the northwestern region of Honduras along the border with Guatemala.

18.     It was part of the conspiracy that cocaine trafficked by the MONTES DTO was

moved through Central America and Mexico to its ultimate destination, the United States.

19.     It was part of the conspiracy that members of the MONTES DTO received drug proceeds from Honduran, Guatemalan, and Mexican co-conspirators through bulk cash payments.

20.     It was part of the conspiracy that the MONTES DTO made and received payment for drug shipments in U.S. currency.

21.     It was part of the conspiracy that the charged co-conspirators laundered the proceeds of the cocaine sales in order to conceal their activities.

22.     It was part of the conspiracy that the defendants then reinvested portions of the proceeds of their United States cocaine sales into subsequent cocaine transportation and distribution business.

23.     It was part of the conspiracy that the members of the MONTES DTO relied on various forms of communication including satellite and cellular phone voice calls, text messaging, BlackBerry PIN to PIN communications, and in person meetings.   In an effort to avoid the detection of law enforcement, members of the MONTES DTO took certain safeguards with regard to their communications, including varying the forms of communication with which they conducted their drug trafficking, frequently changing their phone numbers and devices, using BlackBerry messenger communications which they understood that law enforcement could not intercept, subscribing to their devices in false names or aliases, and speaking in code when discussing cocaine trafficking and associated crimes.

## ACTS IN FURTHERANCE OF THE CONSPIRACY

In order to further the goals and purposes of the conspiracy, the defendants and their co-conspirators committed overt acts, including, but not limited to, the following:

7

24.    In and around 2008, the MONTES DTO received a load of approximately 1,500 kilograms of cocaine, delivered by airplane, on the island of Roatan, Honduras, which the MONTES DTO subsequently distributed to the VALLE DTO.

25.    In and around June 2008, the MONTES DTO received two loads of cocaine, comprised of approximately 500 kilograms of cocaine each, which were delivered by airplane to Colón, Honduras, and which the MONTES DTO subsequently distributed to the VALLE DTO.

26.    From approximately November 2010 to approximately July 2011, the MONTES DTO held a co-conspirator captive in Colón, Honduras, as collateral for a pending cocaine shipment to be delivered to the MONTES DTO from Colombia.

27.    In and around April 2011, the MONTES DTO received two loads of cocaine, comprised of approximately 500-600 kilograms each, which were delivered by boat to Limón, Colón, Honduras.

28.    In and around the spring of 2011, ALEJANDRO distributed approximately 70 kilograms of cocaine to a co-conspirator.

29.    Between approximately 2013 and approximately 2014, NOE sold approximately six loads of cocaine, comprised of approximately 50-60 kilograms of cocaine each, to a co-conspirator.

30.    On or about October 28, 2013, the MONTES DTO received a U.S.-registered airplane bearing tail number N925ES and carrying approximately 1,000 kilograms of cocaine from Venezuela at a landing strip in the village of Flores, near Limón, Colón, Honduras.   The cocaine was moved from the landing strip to a nearby property associated with ERLINDA.

31.    On or about February 17, 2014, NOE communicated with a cooperating source about a maritime cocaine load that NOE had received previously.

32. On or about February 18, 2014, NOE communicated with a co-conspirator about negotiating the shipment of a future cocaine load to be delivered by airplane.

33. On or about February 22, 2014, NOE communicated with GARCIA-TERUEL about negotiating the shipment of a future cocaine load to be delivered by airplane.

34. On or about April 2, 2014, GARCIA-TERUEL communicated with a co-conspirator about the seizure by Honduran law enforcement of six boats associated with the MONTES DTO.

35. On or about June 25, 2015, NOE and GARCIA-TERUEL met with a cooperating source in La Ceiba, Atlantida, Honduras, and discussed the future maritime shipment of a cocaine load from Colombia to be received by the MONTES DTO in Honduras.

36. In and around July 2015, NOE communicated with a cooperating source about coordinating the shipment of a future cocaine load to be delivered by semi-submersible.

37. On or about August 24, 2015, ALEJANDRO and others trafficked approximately 45 kilograms of cocaine *via* boat in the vicinity of Limón, Colón, Honduras.

38. On or about August 25, 2015, NOE and others trafficked approximately 540 kilograms of cocaine *via* boat in the vicinity of Raya, Gracias a Dios, Honduras.

(All in violation of Title 21, United States Code, Section 963.)

## FORFEITURE NOTICE

Pursuant to Fed.R.Crim.P. 32.2(a), the defendants, are hereby notified that if convicted of the violation alleged in this Indictment, they shall forfeit to the United States, pursuant to Title 21, United States Code, Section 853(a) any property constituting, or derived from, any proceeds each defendant obtained, directly or indirectly, as the result of such violation; and any of the defendant's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation. This property includes $50,000,000.00 in United States currency representing proceeds the defendants obtained in the course of the conspiracy, as alleged in Count One of this Indictment.

(Pursuant to Title 21, United States Code, Section 853 and Fed.R.Crim.P.32.2).

A TRUE BILL

Pursuant to the E-Government Act,,
The original of this page has been filed
under seal in the Clerk's Office
Foreperson

Dana J. Boente
United States Attorney

By:  _____
Mary K. Daly
Assistant United States Attorney

_____
William M. Sloan
Assistant United States Attorney